# IN THE SUPREME COURT OF IOWA

No. 11–2087

Filed January 3, 2014

**STATE OF IOWA,**

    Appellee,

vs.

**DAVID LEE MILLER,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Des Moines County, Mary Ann Brown, Judge.

Appellant appeals from judgment and sentence imposed following a conviction for escape in violation of Iowa Code section 719.4(1). **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR A NEW TRIAL.**

Mark C. Smith, State Appellate Defender, and Vidhya K. Reddy, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney General, Patrick C. Jackson, County Attorney, and Tyron T. Rogers, Assistant County Attorney, for appellee.

**CADY, Chief Justice.**

In this appeal, we must decide if the crime of absence from custody is a lesser included offense of the crime of escape. The district court, following case precedent, held the crime of absence from custody was not a lesser included offense, and a jury subsequently found the defendant guilty of the crime of escape. On appeal, the court of appeals affirmed the judgment and sentence of the district court. On further review, we vacate the decision of the court of appeals and reverse the judgment and sentence of the district court. Under the test we have developed to evaluate proposed lesser included offenses in criminal prosecutions in Iowa, we hold the crime of absence from custody is a lesser included offense of the crime of escape and now overrule *State v. Beeson*, 569 N.W.2d 107, 112 (Iowa 1997).[1] We remand the case for a new trial.

## I. Background Facts and Proceedings.

David Miller was committed to the residential correctional facility in Burlington in March 2011 following his release on parole from prison where he was serving a sentence for a felony offense. The facility is under the control of the Iowa Department of Corrections and is commonly referred to as a halfway house. Miller was granted work-release status by the Iowa Board of Parole. According to the rules of the halfway house, Miller could not leave the facility without prior permission and was required to check in and out of the facility when he did have permission to leave. The residents of the halfway house checked in and out at a desk located just inside the front door.

---

[1]While we reverse the judgment of the district court and vacate the decision of the court of appeals, we acknowledge both courts properly relied on our applicable precedent. Generally, it is the role of the supreme court to decide if case precedent should no longer be followed. *See Kersten Co. v. Dep't of Soc. Servs.*, 207 N.W.2d 117, 121–22 (Iowa 1973).

On July 18, 2011, Miller was given permission to leave the halfway house to go to the Iowa Workforce Development Center in Burlington to participate in workforce development classes and to use a computer to look for jobs. After he completed the tasks, Miller returned to the halfway house. He arrived through the front door shortly before 5 p.m. and engaged in a conversation with the residential correctional officer at the desk. Miller claimed he told the officer he intended to leave on another scheduled furlough and go to the residence of his girlfriend. After the residential officer told Miller he did not have permission to leave on another furlough, Miller walked out of the halfway house, exclaiming, "screw it," as he left the building.

Miller was apprehended by the Burlington Police Department nineteen days later. The State subsequently filed a trial information against Miller charging him with the crime of escape in violation of Iowa Code section 719.4(1) (2011).[2]

At trial, conflicting testimony was presented on the question of whether Miller had checked back into the halfway house before leaving again. Miller argued he did not complete the process to check back into the facility, so he could not have escaped from the facility. The State produced evidence that Miller had checked back into the facility, but argued an escape occurred even if the check-in process was not completed because Miller nevertheless intentionally left the halfway house without consent.

Miller requested the jury be instructed that the crime of absence from custody in violation of Iowa Code section 719.4(3) was a lesser

---

[2]All references to the Iowa Code in this opinion refer to the 2011 edition of the Code unless otherwise stated.

included offense of escape. The district court denied Miller's request. The jury subsequently found Miller guilty of escape.

Miller appealed. He argued the district court abused its discretion by refusing to submit the crime of absence from custody as a lesser included offense of escape. He also asserted three claims of ineffective assistance of counsel. We transferred the case to the court of appeals. It denied each claim raised by Miller and affirmed the district court judgment and sentence. We granted Miller's request for further review.

## II. Standard of Review.

" 'We review [a] claim that the trial court should have given the defendant's requested instruction[] for an abuse of discretion.' " *State v. Marin*, 788 N.W.2d 833, 836 (Iowa 2010) (quoting *Summy v. City of Des Moines*, 708 N.W.2d 333, 340 (Iowa 2006)). "Error in giving or refusing to give a particular instruction warrants reversal unless the record shows the absence of prejudice." *Id.* " 'When the error is not of constitutional magnitude, the test of prejudice is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice.' " *Id.* (quoting *State v. Gansz*, 376 N.W.2d 887, 891 (Iowa 1985)). "An abuse of discretion occurs 'when the district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable.' " *Rowedder v. Anderson*, 814 N.W.2d 585, 589 (Iowa 2012) (quoting *Schettler v. Iowa Dist. Ct.*, 509 N.W.2d 459, 464 (Iowa 1993)). "An erroneous application of the law is clearly untenable." *Id.* Thus, under our abuse-of-discretion standard, "we will correct an erroneous application of the law." *Id.*

### III.  Analysis.

**A.  Stare Decisis.**  Judicial decision making is often guided by the precedent of past court decisions.  It is our accepted way and is known as the doctrine of stare decisis.  This cardinal principle of common law is a Latin term meaning "to stand by things decided."  *Black's Law Dictionary* 1537 (9th ed. 2009).  Courts adhere to the holdings of past rulings to imbue the law with continuity and predictability and help maintain the stability essential to society.  *See Barreca v. Nickolas*, 683 N.W.2d 111, 122 (Iowa 2004).  Our experience has shown the enduring value of this approach.  Yet, our experience has also revealed times when we must overturn our precedent.  One such time is when it becomes apparent, in one way or another, that the prior decision was clearly erroneous.  *McElroy v. State*, 703 N.W.2d 385, 394–95 (Iowa 2005).  Just as with the character of a person, it is better for courts to correct mistakes when they surface rather than allow them to become ingrained in perpetuity.  This response does not disregard the value of precedent but serves the greater good of justice.

If we were to follow our court precedent in this case, the decision would be clear and brief.  Sixteen years ago, we held that the crime of absence from custody was not a lesser included offense of escape.  *Beeson*, 569 N.W.2d at 112.  However, we now conclude this holding was clearly wrong, primarily because the approach we followed failed to consider and analyze the issue using our familiar legal principles governing lesser included offenses.  In following this analytical path now, we can identify our mistake and correct it.

**B.  Lesser Included Offense Analysis.**  We begin our analysis of the legal issue in this case by reviewing our law governing lesser included offenses.  From the beginning of our statehood, Iowa law recognized the

availability of lesser included offenses.  *See Orton v. State*, 4 Greene 140, 142 (Iowa 1853) ("A defendant may be found guilty of any offense, the commission of which is necessarily included in that with which he is charged in the indictment.").  The doctrine dates at least to sixteenth-century English common law and "allows a trier of fact to convict a defendant of an offense less serious than the one charged."  *State v. Jeffries*, 430 N.W.2d 728, 730 (Iowa 1988); *accord* Thomas Andrew Green, *Verdict According to Conscience: Perspectives on the English Criminal Trial Jury 1200–1800*, at 31–52 (1985) [hereinafter Green] (examining the discretion medieval common law juries enjoyed to distinguish between murder and "simple homicide"—a lesser, noncapital offense—and speculating this discretion may date to shortly after the Norman conquest); Janis L. Ettinger, *In Search of a Reasoned Approach to the Lesser Included Offense*, 50 Brooklyn L. Rev. 191, 195 (1984) ("As early as 1554, an English jury in a murder case was permitted to return a guilty verdict in a form of homicide carrying a less severe sentence than the crime originally charged.").

Although some jurists have remarked the doctrine was originally developed as a useful tool for the prosecution, *see Keeble v. United States*, 412 U.S. 205, 208, 93 S. Ct. 1993, 1995, 36 L. Ed. 2d 844, 847 (1973), some commentators dispute this view, pointing out the doctrine's early use as a vehicle for mercy by a jury, *see* Green, at 35–46 (examining several cases in which juries used expansive fact-finding powers to construe facts in a manner to convict a defendant of a lesser, pardonable form of homicide).  In any event, the doctrine has evolved to become an important component of procedural fairness and substantial justice for the accused in a criminal case.  *Cf. Keeble*, 412 U.S. at 208, 93 S. Ct. at 1995, 36 L. Ed. 2d at 849–50 (determining whether a

defendant is entitled to a lesser included offense jury instruction when prosecuted under the Major Crimes Act of 1885, 18 U.S.C. §§ 1153, 3242 (1970), and no lesser included offense is enumerated by statute). The Court elucidated this idea in *Keeble*:

> Moreover, it is no answer to petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction.

*Id.*

The lesser included offense doctrine also implicates either or both the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, at least in capital cases. *See Beck v. Alabama*, 447 U.S. 625, 637–38, 100 S. Ct. 2382, 2389–90, 65 L. Ed. 2d 392, 402–03 (1980). It may raise other constitutional concerns as well. *See Jeffries*, 430 N.W.2d at 734–35; Christen R. Blair, *Constitutional Limitations on the Lesser Included Offense Doctrine*, 21 Am. Crim. L. Rev. 445, 446 (1984) [hereinafter Blair].[3]

---

[3]In *Beck*, the United States Supreme Court held a state statute that prohibited instructing the jury regarding lesser included offenses in capital cases was unconstitutional. 447 U.S. at 635, 100 S. Ct. at 2388, 65 L. Ed. 2d at 401–03. The Court has discussed *Beck* since its decision, but has not yet decided whether it applies to noncapital cases. *See, e.g.*, *Hopkins v. Reeves*, 524 U.S. 88, 94–97, 118 S. Ct. 1895, 1900–01, 141 L. Ed. 2d 76, 84–86 (1998); *Schad v. Arizona*, 501 U.S. 624, 646–48, 111 S. Ct. 2491, 2504–05, 115 L. Ed. 2d 555, 574–76 (1991); *Spaziano v. Florida*, 468 U.S. 447, 454–57, 104 S. Ct. 3154, 3159–60, 82 L. Ed. 2d 340, 348–50 (1984); *Hopper v. Evans*, 456 U.S. 605, 610–12, 102 S. Ct. 2049, 2052–53, 72 L. Ed. 2d 367, 372–73 (1982).

Aside from the constitutional evolution of the lesser included offense doctrine, the challenges we have faced in this area of the law have primarily involved the development of the test to determine the existence of lesser included offenses for a particular crime. The test we have settled on to determine whether a crime is a lesser included offense of a greater crime generally inquires "whether the greater offense cannot be committed without also committing all elements of the lesser offense." *State v. Coffin*, 504 N.W.2d 893, 894 (Iowa 1993). This approach is called the "impossibility test" and is "[t]he paramount consideration in determining submissibility of lesser-included offenses." *State v. Turecek*, 456 N.W.2d 219, 223 (Iowa 1990).

The usual method to ascertain whether it is possible to commit the greater offense without committing the lesser is to strictly compare the elements of the two crimes—something we have called the "strict statutory-elements approach." *Jeffries*, 430 N.W.2d at 730–31, 736.[4] Under this approach, if the elements of the proffered lesser included offense are found in the putative greater offense (and the greater offense contains at least one additional element), then it will be legally impossible to commit the greater offense without simultaneously committing the lesser offense. *Id.* at 730–31. We noted in *Jeffries*, "If the lesser offense contains an element not required for the greater offense, the lesser cannot be included in the greater." *Id.* at 740.

---

[4]While other states use different tests, such as the cognate-evidence approach, neither party asks us to depart from the *Jeffries* holding or the elements test. *Jeffries* articulated several benefits to the elements test. 430 N.W.2d at 737–39. However, we did note in *Jeffries* that if due process requires giving a lesser included offense instruction to ensure the reliability of the fact-finding process, it is not clear that either the elements test or the impossibility test could satisfy the due process standard. *Id.* at 735; *see also* Blair, 21 Am. Crim. L. Rev. at 464–72.

The elements test is theoretically attractive "because its application only involves comparing the elements of the individual offenses in the abstract. Difficulties, however, in statutory interpretation can arise, which makes application of the rule less than certain in many cases." Blair, 21 Am. Crim. L. Rev. at 447. This case illustrates the difficulty forecasted by the commentator upon whom we relied heavily in *Jeffries*. As we noted in *Jeffries*, "While described as the easiest . . . approach[] to apply, the strict statutory-elements approach has been criticized as inherently inflexible." 430 N.W.2d at 730; *accord* Blair, 21 Am. Crim. L. Rev. at 447.

We clarified the *Jeffries* rule in the years following the decision in an effort to improve upon its application to other cases. Notably, we cautioned against applying the elements approach overly restrictively and to the exclusion of the broader impossibility inquiry. *State v. McNitt*, 451 N.W.2d 824, 824–25 (Iowa 1990). Indeed, in a case decided almost contemporaneously with *McNitt*, we emphasized that "[t]he comparison of the elements of the greater and lesser crimes, sometimes referred to as the 'elements test,' is only resorted to as an aid in applying the impossibility test and is fully subsumed therein." *Turecek*, 456 N.W.2d at 223.

In *McNitt*, the defendant was charged and convicted of sexual abuse in the third degree. 451 N.W.2d at 824. At trial, the district court refused to instruct the jury that the crime of assault with intent to commit sexual abuse was a lesser included offense. *Id.* That court reasoned that assault with intent to commit sexual abuse was a specific-intent crime, while the greater offense of sexual abuse in the third degree was a general-intent crime. *Id.* We observed that "[a]pplying the strict statutory elements test without incorporating the 'impossibility test,'

yields the result that assault with intent to commit sexual abuse is not a lesser-included offense of sexual abuse in the third degree." *Id.*

Thus, we rejected this result, calling it "too restrictive an interpretation of our decision in *Jeffries*." *Id.* at 825. We characterized *Jeffries* as merely dispensing with the "factual test" contained in prior lesser included offense jurisprudence, *id.,* which "require[d] an ad hoc factual determination that there is an evidentiary basis for submitting the lesser included offense to the jury," *State v. Johnson*, 291 N.W.2d 6, 7 (Iowa 1980). We concluded:

> It is obvious that when the "impossibility test" is applied, McNitt was entitled to his proposed instruction on the lesser included offense. Sexual abuse in the third degree cannot be committed without also committing the crime of assault with intent to commit sexual abuse.

*McNitt*, 451 N.W.2d at 825.

We have also pointed out that "[i]t is not essential that the elements of the lesser offense be described in the statutes in the same manner as the elements of the greater offense." *Turecek*, 456 N.W.2d at 223. For instance, elements of one offense can also be combined to match compound elements of the other offense. *State v. Waller*, 450 N.W.2d 864, 866 (Iowa 1990) (equating the first element of criminal trespass under Iowa Code section 716.7(2)(*c*) (1987)—"entering"—with the first two elements of burglary under section 713.1—"entry" and "by a person"). Similarly, an offense may be a lesser included offense even though an element of a lesser offense is phrased differently and may be committed in a broader array of factual circumstances so long as the narrower element contained in the greater offense cannot be committed without committing the broader element in the lesser included offense. *See id.* ("Entry upon or in property . . . does not always constitute entry

into an occupied structure . . . . Entry into an occupied structure, however, always constitutes entry upon or in property . . . ."). Thus, a particular element of the lesser offense does not need to be identical in meaning with a particular element of the greater offense so long as the meanings of the two elements overlap so that the element of the greater offense cannot be satisfied without also satisfying the element of the lesser offense.[5]

We have also emphasized the concept that the greater offense must have at least one additional element not found in the lesser offense. *See Coffin*, 504 N.W.2d at 896–97. We stated:

> Our legal or elements test requires that the lesser offense be composed solely of some *but not all of the elements of the greater offense*. In short, the greater offense must have an element not found in the lesser offense. Without such a dissimilar element, it is not proper to submit a lesser included offense.

*Id.* at 896 (citation omitted). Thus, *Coffin* recognizes a straightforward truth about a lesser included offense analysis: When absolute identity exists between the elements of two offenses, one offense may not be submitted as the lesser included equivalent of the other, irrespective of the level of punishment each offense carries. *See id.* (holding district court did not err when it refused to submit a lesser included offense instruction when there was complete identity of the elements between the crimes of extortion, a class "D" felony, and second-degree robbery, a class "C" felony). This is because one offense is not actually a *lesser included* offense, but rather an *alternative* offense. *See id.* at 896–97. In

---

[5]This important principle is not the same as the principle governing alternative definitions of statutory elements of crimes. When a statute has alternative definitions, the relevant definition asserted by the prosecutor is used, and that element is compared to the alternative definition asserted by the defendant. *See Waller*, 456 N.W.2d at 866.

this limited situation, instructing the jury regarding the proffered lesser included offense "would . . . infringe upon prosecutorial discretion as to which charge to file." *Id.* at 897.

**C. Analysis of Lesser Included Crimes of Escape.** To begin the process of determining the existence of a lesser included offense in this case, as in any case, the first task is to look at the elements of the marshaling instruction actually submitted to the jury. *Turecek*, 456 N.W.2d at 223; *see also State v. Hickman*, 623 N.W.2d 847, 850 (Iowa 2001). The elements of the crime described in the instruction are then compared with the statutory elements of the proposed lesser included offense to "determine if the greater offense can be committed without also committing the lesser offense." *Hickman*, 623 N.W.2d at 850.

In this case, the district court instructed the jury on the elements of escape pursuant to the instruction modeled after Iowa Bar Association Criminal Jury Instruction 1900.1. The instruction, under the theory prosecuted by the State, identified the following elements of the crime of escape:

(1) The defendant had previously been convicted of a felony . . . .

(2) By reason of that conviction, the defendant had been placed in custody of [a community-based correctional facility in Burlington].

(3) . . . [T]he defendant intentionally left the . . . [f]acility, without the consent or authority of the custodian.

In turn, the statutory elements of the crime of absence from custody are: (1) the defendant had previously "been committed . . . to a community-based correctional facility"; and (2) the defendant "knowingly and voluntarily is absent from a place" the defendant was "required to be." Iowa Code § 719.4(3). In comparing the elements of the two crimes, Miller argues the instruction he proposed reveals absence from custody

was a lesser included offense of escape. Thus, we turn to examine this argument under our test.

When the elements of the marshaling instruction for escape are juxtaposed with the statutory elements of the crime of absence from custody, the first element of escape can be quickly identified as an additional element of the greater offense of escape. The crime of absence from custody does not include a requirement that the defendant be convicted of a felony or misdemeanor. Thus, we must compare the remaining elements to determine if the crime of absence from custody is a lesser included offense.

The second element of escape coincides with the first element of absence from custody. If a defendant has been committed to a community-based correctional facility by reason of a felony conviction, the defendant must necessarily also have been committed to a community-based correctional facility. Thus, the fighting question concerns the comparison of the "intentionally left" element from the marshaling instruction for the crime of escape with the absent-from-a-place statutory element of the crime of absence from custody. We must compare intentionally leaving the facility without consent with being "knowingly and voluntarily absent from a place where the person is required to be." *See* Iowa Code § 719.4.

In determining whether these two elements share the identity necessary to make absence from custody a lesser included offense of escape, we must ascertain their meaning. If "intentionally left" and "absent from a place" have entirely separate meanings, then *Beeson* is correct and absence from custody is not a lesser included offense of escape. *See* 569 N.W.2d at 112.

We begin by considering the predecessor statutes to section 719.4. A review of the historical development of a statute can often be helpful in revealing the meaning of the statute. Both escape and absence from custody, as defined in section 719.4, had predecessor statutes. *See* Iowa Code § 247A.6 (repealed by 1976 Iowa Acts ch. 1245, § 525); *id.* § 745.1 (1975) (repealed by 1976 Iowa Acts ch. 1245, § 526). In fact, escape— particularly as it was defined in section 745.1—has been a statutory crime for well more than a century in Iowa. *See* Iowa Code § 4897-a (Supp. 1907); *id.* § 4294 (1860); *id.* § 2667 (1851). Section 745.1 provided:

> If any person committed to the penitentiary or to the men's or women's reformatory shall break such prison and escape therefrom or shall escape from *or leave without due authority* any building, camp, farm, garden, city, road, street, *or any place whatsoever in which he is placed or to which he is directed to go or in which he is allowed to be* by the warden or other officer or employee of the prison whether inside or outside of the prison walls, he shall be deemed guilty of an escape from said penitentiary or reformatory and shall be punished by imprisonment in said penitentiary or reformatory for a term not to exceed five years, to commence from and after the expiration of the term of his previous sentence.

Iowa Code § 745.1 (1975) (emphasis added).[6] As revealed by the statute, escape was a crime committed by persons who had been committed to prison, and the place of escape not only included the prison itself, but "any place" the prisoner had been directed to be, either inside or outside the prison walls. Moreover, we have long recognized that escape meant departure without authority. *See State v. Burtlow*, 299 N.W.2d 665, 668

---

[6]A similar statute in chapter 745 prohibited escape from a county jail. Iowa Code § 745.8.

(Iowa 1980).[7]  Thus, escape only concerned unauthorized departure, and the custodial setting from which a person could escape included a prison as well as a place where the person was directed to be by the warden.

The legislature, however, separately enacted statutes over the years following the enactment of the escape statute to additionally punish the unauthorized failure to return to a place or facility.  *See State v. Davis*, 271 N.W.2d 693, 696 (Iowa 1978) (mentioning those statutes demonstrating that the legislature knew how to specifically punish the failure to return).  More specifically, a statute governing the failure to return from a furlough was enacted as a part of the legislature's decision to adopt a furlough program in Iowa known as the state's work release program.  *See* Iowa Code §§ 247A.2, .6 (1975).  The program authorized the temporary release from confinement in a correctional institution conditioned on a duty to return when the furlough terminated.  *See id.* This statute made it a crime to fail to return.  It provided:

> Any inmate released from actual confinement under a work release plan who willfully fails to return to the designated place for housing at the time specified in the plan shall be guilty of a felony and upon conviction be subject to the penalty provided in section 745.1.

*Id.* § 247A.6.

---

[7]Under a previous version of the statute, a physical "breaking" was an indispensable element of the crime of escape; thus, an inmate permitted to leave the penitentiary who hid from guards at the time to return to the penitentiary—eluding detection by dropping into a natural crevice in a rock quarry—and thereafter departed from the quarry could not be convicted of escape.  *See State v. King*, 114 Iowa 413, 414–15, 87 N.W. 282, 283 (1901); *see also* Iowa Code § 4294 (1860) (defining escape from penitentiary as the "break [from] prison and escape from thence").  Clearly intending to overrule *King*, our legislature immediately repealed the prior version of the statute and replaced it with the more broadly worded version ultimately found in section 745.1.  *See* 1901 Iowa Acts ch. 147, § 1 (codified at Iowa Code § 4897-a (Supp. 1907) (repealing Iowa Code § 4897 (1897))); Iowa Code § 745.1 (1975) (repealed by 1978 Iowa Acts ch. 1245, § 526).

Accordingly, escape and failure to return existed as separate crimes in Iowa, but both concepts were developed to apply to any place the person was committed or required to be. As the concept of escape grew with the changing forms of incarceration in Iowa over the years, the legislature sought to enact new escape statutes to fully capture the changing circumstances. For sure, our cases recognized periodic gaps between the escape law and the different conduct that was associated with the changing nature of escape, emphasizing the limitations of the existing statutes governing both escape and the failure to return from an authorized departure. *See, e.g.*, *Burtlow*, 299 N.W.2d at 669–70 (recognizing the failure to return from an authorized furlough did not constitute escape); *State v. Gowins*, 211 N.W.2d 302, 306 (Iowa 1973) (comparing Iowa's statutory prohibitions of escape and failure to return); *State v. King*, 114 Iowa 413, 414–15, 87 N.W. 282, 283 (1901) (holding an inmate who does not complete an escape without some breaking or actual force could not be convicted of escape as defined in Iowa Code section 4897 (1897)). Additionally, we observed other gaps in the law that failed to capture the conduct of inmates that put them in a place within the prison they were not authorized to be. *See Davis*, 271 N.W.2d at 694, 696 (holding an inmate who left his cell for dinner but went to the library to drink liquor with other inmates instead of returning to his cell could not be found guilty of escape under section 745.1 (1975)).

The legislature then overhauled the law of escape in 1976 as part of its comprehensive rewrite of the Iowa Criminal Code. *See id.* The legislature brought the various concepts of escape together in section 719.4 by delineating four separate crimes of escape. *Burtlow*, 299 N.W.2d at 669. The relevant subsections under consideration in this case are sections 719.4(1) and (3), which provide as follows:

> 1. A person convicted of a felony, or charged with or arrested for the commission of a felony, who intentionally escapes, or attempts to escape, from a detention facility, community-based correctional facility, or institution to which the person has been committed by reason of the conviction, charge, or arrest, or from the custody of any public officer, public employee, or any other person to whom the person has been entrusted, commits a class "D" felony.
>
> . . . .
>
> 3. A person who has been committed to an institution under the control of the Iowa department of corrections, to a community-based correctional facility, or to a jail or correctional institution, who knowingly and voluntarily is absent from a place where the person is required to be, commits a serious misdemeanor.

Iowa Code § 719.4(1), (3).

Subsection 1 continued to address the traditional escape conduct of departure without authority from a detention facility or institution, largely in the way that the concept has always been defined in Iowa. *See Burtlow*, 299 N.W.2d at 669. Subsection 3, however, broadened the concept of escape by widening the scope to include being "absent from a place where the person is required to be." Iowa Code § 719.4(3). Thus, subsection 3 now broadens escape from the analog statutes that covered the conduct associated with "failing to return" to introduce the concept of being "absent" from a place a person is required to be as a form of escape. The question then is whether the concept of being absent from a place excludes the traditional notion of escape covered in subsection 1 or includes this traditional form of escape.

The legislative history recognizes our legislature was seeking to capture all forms of escape as a crime within the statute, and it wrote the new statute to delineate different crimes as a means to keep the traditional form of escape separate to allow for different punishment. *See id.* § 719.4(1), (3) (describing escape as a felony under subsection 1, and a serious misdemeanor under subsection 3). The need for a different

punishment is tied to the view that the unauthorized departure aspect of escape presents a greater danger of injury to persons or property, especially when the escapee is a felon. *See Burtlow*, 299 N.W.2d at 669. Yet, the legislature clearly wanted to capture all forms of escape in rewriting the statute and accomplished this goal by adopting the concept of being absent.

The word "absent" means "to be away" or to be "not present." *Webster's Third New International Dictionary* 6 (unabr. ed. 2002). Importantly, the meaning of this term does not include specific types of conduct that might make a person absent. Instead, the term was used by the legislature as a predicate adjective to describe a person who is unable to be found in a place or is away from or not present in a place. Thus, the legislature varied from its historical approach of defining the escape crimes by describing the prohibited conduct and took an approach under the new law of describing escape with a broader term that does not depend on any particular form of conduct.

The legislature clearly wanted the new statute to cover the failure of a person to return to a facility by adopting the comprehensive phrase "absent from a place where the person is required to be." *See* Iowa Code § 719.4(3). Thus, a place must necessarily include the facility itself. Additionally, a person who leaves a correctional facility without authority is necessarily a person who is absent from a place the person is required to be. There is simply no principled reason to conclude a person "is absent from a place" by failing to return to a facility from a furlough, but is not also absent from the facility by leaving without authority. This situation parallels the lesser included offense analysis in *Waller*. Just as entry into an occupied structure under burglary always constitutes entry

upon property under trespass, a person who intentionally escapes from a facility will always be absent from a place the person is required to be.[8]

Notwithstanding, the State argues that some of the pronouncements in our prior cases reveal that the two offenses have different elemental custodial requirements. In *Burtlow*, we found that the defendant's conduct did not satisfy the elements of escape because he did not depart from "physical restraint." 299 N.W.2d at 669. In *State v. Breitbach*, we clarified that physical restraint does not require actual physical contact, but rather that "an individual either is or *would be* subjected to immediate physical restraint if an attempt to flee from authorities was made." 488 N.W.2d 444, 449 (Iowa 1992). The State contends these cases show that absence from custody was intended to punish completely different conduct than escape. However, consistent with our legislative history, absence from custody punishes broader conduct than escape. While absence from custody "*can* apply to . . . [persons] . . . who are not being held physically in confinement and whose actions do not constitute a breach of any physical restraint," it is also broad enough to apply to persons being held in physical restraint. 4 J. Yeager & R. Carlson, *Iowa Practice: Criminal Law and Procedure* § 428, at 110 (1979) [hereinafter Yeager & Carlson] (emphasis added). In other

---

[8]We acknowledge the crime of escape intuitively conjures a different image than the crime of absence from custody. Yet, the same can be said of burglary and criminal trespass, which we have held are greater and lesser included offenses under certain alternatives. *Waller*, 450 N.W.2d at 866. This intuitive approach reveals the importance of deciding lesser included offense questions based on the tests we have developed, and it might also help explain the result in *Beeson*. Of course, if the legislature did not intend for the escape element of the crime of escape to be subsumed in the absent element of the crime of absence from custody, it can amend the statute to reflect its true intent. We also acknowledge that the similarity between the two crimes may present a challenge for juries at times, but no more than the challenges of prosecuting a burglary accompanied by the lesser included offense of trespass.

words, absence from custody can apply to persons held in either actual or constructive custody, while escape applies only to persons held in actual custody. *See Breitbach*, 488 N.W.2d at 449; *Burtlow*, 299 N.W.2d at 669. Thus, if a person satisfies the custody requirement of escape, then the custody requirement of absence of custody is also necessarily satisfied.

The State also argues a person could be guilty of escape under section 719.4(1) without satisfying all the elements of absence from custody under section 719.4(3) because the element of escape under subsection 1 also includes "attempts to escape." Iowa Code § 719.4(1). It asserts this alternative element means Miller cannot satisfy the impossibility test because a person can attempt to escape but not be absent from the place the person is required to be.

While the State correctly observes that attempt to escape is a different element than being absent, our lesser included offense analysis compares the two crimes " 'in the manner in which the State has sought to prove those elements.' " *Coffin*, 504 N.W.2d at 895 (quoting *Turecek*, 456 N.W.2d at 223). "[W]hen a statute provides alternative ways of committing the offense, the alternative submitted to the jury controls." *State v. Anderson*, 565 N.W.2d 340, 344 (Iowa 1997). Here, the marshaling instruction did not include "attempt" or any other alternative element from section 719.4(1). Thus, it does not matter that some alternatives of escape can be committed without necessarily committing absence from custody because those alternatives were not charged by the State.[9]

---

[9]In some cases, there may be applicable alternatives of the escape offense that do not necessarily satisfy the elements of absence from custody. Thus, absence from custody may not always be a lesser included offense of escape.

Therefore, the two elements under examination sufficiently match for the purposes of the lesser included offense test. This conclusion means it is impossible under the alternative of the criminal offense charged in this case to commit the greater offense of escape from custody without also committing the lesser included offense of absence from custody.

We can now look back to see that we failed to conduct a detailed analysis of the jurisprudence on lesser included offenses in *Beeson*. Instead, we relied on *Burtlow* to hold that "[t]he crimes of escape and voluntary absence are distinct from each other and contain different elements. Therefore, voluntary absence is not a lesser included offense of escape." *Beeson*, 569 N.W.2d at 112.

*Beeson* simply interpreted *Burtlow* too broadly. *Burtlow* was a 1980 decision, one of the first opportunities to interpret the 1976 overhaul of the escape statute. *See* 299 N.W.2d 665. The defendant in the case initially pled guilty to escape after failing to return from a furlough from a state work release center. *Id.* at 667. On appeal, we held these facts supported a conviction for absence from custody but not escape. *Id.* at 669. In doing so, we noted that the legislature's 1976 amendments to the escape statute did not simply restate the existing general escape statute, but rather overhauled the law to differentiate between different levels of criminality. *See id.* at 668. We explained the statute:

> Subsection one of section 719.4 obviously applies when a person convicted or charged with a felony intentionally departs without authority from a detention facility or institution to which the person has been committed on the conviction or charge. This is true whether the departure is accomplished through "stealth, guile or violence."

*Id.* at 669 (quoting 4 Yeager & Carlson § 426, at 110). In contrast, "[s]ubsection three of the statute obviously applies when a prisoner is absent without authority from a place he is required to be, even if he has not left the premises of the institution or detention facility." *Id.* (citing 4 Yeager & Carlson § 428, at 110); *see also Davis*, 271 N.W.2d at 696 (holding prisoner had not committed escape when prisoner was merely hiding in the prison library drinking liquor).

While *Burtlow* correctly identified that the new escape statute required different elements to establish guilt for different types of escape offenses, the decision does not stand for the proposition that all of the elements of these offenses are different. In other words, just because the facts in *Burtlow* were insufficient to satisfy all of the elements of escape, it does not follow that the separate crime of absence from custody cannot be a lesser included offense. The *Beeson* decision mistakenly took the discussion of the different elements identified in *Burtlow* and used it to hold that absence from custody can never be a lesser included offense of escape. *Beeson*, 569 N.W.2d at 112. If we had fully applied either the impossibility test or its subsidiary, the elements test, we would have reached the correct conclusion. Since *Burtlow* merely identified that the escape statute had been expanded into varying levels of offenses, and the *Beeson* decision failed to apply a sufficient lesser included test, we decline to follow *Beeson* in this case.

It is true that "we presume the legislature is aware of our cases that interpret its statutes" and "[w]hen many years pass following such a case without a legislative response, we assume the legislature has acquiesced in our interpretation." *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (Iowa 2013). However, it is also true that "legislation sometimes persists on account of 'inattention and default

rather than by any conscious and collective decision.' " *McElroy*, 703 N.W.2d at 395 (quoting Ronald Dworkin, *Law's Empire* 319 (1986)). In applying the principle of acquiescence to this case, we do not believe the lack of an explicit response by our legislature to the *Beeson* decision has signaled its acquiescence of our holding. For sure, we did not express the holding as one of statutory interpretation, and we did not utilize any specific principles of statutory construction in reaching the decision. Further, the identity of lesser included offenses is not normally considered to be a product of statutory interpretation, but the application of the common law tests we have developed over the years.

In considering the relief that should be granted in this case, we recognize the failure to instruct a jury on a proffered lesser included offense does not automatically require reversal. *State v. Negrete*, 486 N.W.2d 297, 299 (Iowa 1992). Yet, failure to instruct the jury as to a lesser included offense that formed a primary part of the defendant's defense is generally prejudicial. *See State v. Mikesell*, 479 N.W.2d 591, 591–92 (Iowa 1991) (per curiam). Notably, in *Mikesell*, we found the failure to instruct the jury was prejudicial because the defense essentially conceded the elements of the lesser offense while disputing only one element of the greater offense. *Id.* In this case, Miller's primary defense was that his conduct did not cover the more narrow element of escape because he never checked back into the facility from his furlough, but instead covered the broader element of being absent from the facility at a time when he was required to be at the facility.[10] Accordingly, we

---

[10]Miller did admit at trial that he heard the correctional officer at the check-in desk say that he did not have permission to leave the facility. Yet, Miller otherwise claimed he was entitled to leave the facility for another furlough. Under the circumstances, the jury question was presented to support the submission of the lesser included offense instruction.

hold that the district court's failure to instruct the jury on Miller's lesser included offense was prejudicial.

## IV. Conclusion.

When comparing the statutory elements of absence from custody to the elements of escape, as set out by the marshaling instructions, absence from custody is a lesser included offense of escape in this case. Our contrary holding in *Beeson*, 569 N.W.2d at 112, was clearly wrong, and we now overrule that holding. Consequently, the district court erroneously applied the law and abused its discretion when it failed to instruct the jury on the requested lesser included offense, and this error visited prejudice on Miller. We reverse and remand for new trial.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR A NEW TRIAL.**

All justices concur except Zager, J., who concurs specially.

**ZAGER, Justice (concurring specially).**

I agree with the majority's conclusion that voluntary absence is a lesser included offense of escape. Nevertheless, I write separately because I suspect that the statute as written was intended to cover separate and distinct offenses.

I agree with the majority's comment that the fighting question concerns the comparison of the "intentionally left" element from the marshaling instruction for the crime of escape with the absent-from-a-place element of the crime of voluntary absence. I also agree that in determining whether these two elements share the identity necessary to make voluntary absence a lesser included offense of escape, we must ascertain their meanings. *See State v. Burtlow*, 299 N.W.2d 665, 668 (Iowa 1980) (indicating the issue of whether conduct falls under section 719.4(1), but not section 719.4(3) raises a question of statutory interpretation). If "escape" and "absent from a place" have entirely separate meanings, absence from custody is not a lesser included offense of escape. In reading the statute, it is reasonable to conclude that these elements have separate meanings.

Iowa Code section 719.4(1) does not define what it means to "escape." We have said an escape is an intentional departure without authority from a detention facility or other institution. *See Burtlow*, 299 N.W.2d at 669 (explaining when the escape statute applies). Black's Law Dictionary defines "escape" as "[t]he departure . . . out of custody of a person who was lawfully imprisoned before he is entitled to his liberty by the process of law." *Black's Law Dictionary* 544 (6th ed. 1990). As the majority notes, escape and absence from custody conjure different images. It is not only these different images, but also the different

language in the separate provisions that might lead a court to conclude the legislature intended to create two distinct offenses.

Iowa has made escape a statutory crime since at least 1851. *See* Iowa Code § 2667 (1851). However, prior to the complete rewrite of the Iowa Criminal Code in 1976, our statute made no criminal distinction between escape from a penitentiary or being out of a place from where the warden allowed the prisoner to be, whether inside or outside of the prison walls. *See id.* § 745.1 (1975). While not specifically mentioning escape as a felony, a person guilty of escape was punished by imprisonment for a term not to exceed five years. *See id.*

The legislature also enacted separate statutes to punish the unauthorized failure to return to a place or facility. *State v. Davis*, 271 N.W.2d 693, 696 (Iowa 1978) (noting distinction between escape and statutes addressing unauthorized failure to return). Specifically, Iowa Code section 247A.6 provided:

> Any inmate released from actual confinement under a work release plan who willfully fails to return to the designated place for housing at the time specified in the plan shall be guilty of a felony and upon conviction be subject to the penalty provided in section 745.1.

By these statutory enactments, it is clear that the legislature intended there to be harsh consequences for escape from custody, whether from a secured facility or a failure to return from a furlough. The penalties were the same: a felony with up to five years imprisonment. *See id.* § 745.1.

The legislature overhauled the law of escape in 1976 as part of its comprehensive rewrite of the Iowa Criminal Code. In the process, the legislature attempted to delineate the various concepts of escape. *See id.* § 719.4 (1979); *see also Burtlow*, 299 N.W.2d at 669 (noting the new statute delineated separate escape offenses). What is significant,

however, is that the statute itself was changed on several occasions since its initial enactment, particularly subsection 3.

The initial language of subsection 3 used the language "voluntarily absents." 1976 Iowa Acts ch. 1245, ch. 1, § 1904(3) (codified at Iowa Code § 719.4(3) (1979)). The 1985 amendment changed the language to "voluntarily *leaves.*" Iowa Code § 719.4(3) (1985) (emphasis added). Then in 1986, the legislature made the most substantive change in subsection 3. The legislature removed the language "leaves" a place and substituted "is absent from," such that the statute punishes a person who "is absent from a place where the person is required to be." 1986 Iowa Acts ch. 1238, § 30 (codified at Iowa Code § 719.4(3) (1987)). This court previously concluded the 1986 change to the statute was an error correction. *See State v. Francois*, 577 N.W.2d 417, 419 (Iowa 1998). In that case, however, the court did not consider whether the change affected the criminal conduct under Iowa Code section 719.4(3) (1995) as it related to the criminal act of escape under Iowa Code section 719.4(1), as we must in this case. *See id.* (concluding the change in statutory language does not indicate the crime of absence from custody is a continuing offense).

The elimination of "leaves" in the context of the escape statute is important for several reasons. First, the legislature removed the necessity of having to physically leave a place where a person has been committed to custody in order to be guilty of voluntary absence from a place as defined in Iowa Code section 719.4(3) (1987). We presume that the legislature has a reason for substituting one word for another when it changes a statute. *See Midwest Auto. III, LLC v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 425 (Iowa 2002) ("[A] material modification of statutory language raises a presumption that a change in the law was intended.");

*State v. Ahitow,* 544 N.W.2d 270, 273 (Iowa 1996) ("[A]ny material change in the language of a statute is presumed to alter the law."). Here, it is reasonable to assume the legislature intended that the crime is for being out-of-placement, rather than leaving custody.

Second, the crime of voluntary absence is a serious misdemeanor while the crime of escape is a class "D" felony. *Compare* Iowa Code § 719.4(3) (2011) (punishing voluntary absence as a serious misdemeanor), *with id.* § 719.4(1) (punishing escape as a class "D" felony). A class "D" felony carries the possibility of five years imprisonment. *Id.* § 902.9(5). In contrast, a person convicted of a serious misdemeanor faces at most one year imprisonment. *Id.* § 903.1(1)(*b*). The need for a different punishment is tied to the view that an escape from custody presents a far greater danger to the public than merely being out-of-placement. *See Burtlow,* 299 N.W.2d at 669 (explaining the reasoning behind punishing these two types of conduct differently). This is precisely why I believe the legislature intended to create two separate and distinct crimes with two separate and distinct punishments. To include a crime for being out-of-placement with our general escape statute would be duplicative and redundant. We assume that the legislature does not write statutes that are duplicative and redundant. *See Hardin Cnty. Drainage Dist. 55, Div. 3, Lateral 10 v. Union Pac. R.R.,* 826 N.W.2d 507, 512 (Iowa 2013) (explaining that when ascertaining legislative intent, we interpret the statute so that no part of it is redundant or irrelevant). We also have to interpret the entire statute and give effect to its various parts. *See State v. Romer,* 832 N.W.2d 169, 176 (Iowa 2013) (explaining that when interpreting statutes, we must evaluate the entire statute). Applying our rules of statutory construction, a court could conclude the difference in possible prison terms imposed

for these offenses indicates a legislative intent to create two separate and distinct crimes. Until today, that conclusion would have been reasonable.

It is also important to note that our court had the benefit of this most recent statutory language on escape when it decided *State v. Beeson*, 569 N.W.2d 107 (Iowa 1997). As in this case, Beeson had requested an instruction stating voluntary absence was a lesser included offense of escape. *See id.* at 112. As the majority states in this case, we explained in *Beeson* that "[a]n offense is a lesser-included offense of the greater when the greater offense cannot be committed without also committing the lesser crime." *Id.* Our court concluded that escape and voluntary absence have different elements, and it highlighted the differences as follows:

> "[s]ubsection one of section 719.4 obviously applies when a person convicted or charged with a felony intentionally departs without authority from a detention facility or institution to which the person has been committed on the conviction or charge. This is true whether the departure is accomplished through stealth, guile or violence. Subsection three of the statute obviously applies when a prisoner is absent without authority from a place he's required to be, even if he has not left the premises of the institution or detention facility."

*Id.* (quoting *Burtlow*, 299 N.W.2d at 669) (citation and internal quotation marks omitted).

In modern day corrections, there is clearly a difference between the concept of being absent from a place a person is required to be and the traditional notion of escape. With residential facilities now an integral part of corrections, there are a multitude of reasons for a person committed to such a facility to be absent, to be away, or to not be present at such a facility, none of which constitute an escape from custody. Examples include work, training, school, job search, or even an

authorized visit to a significant other. Subsection 3 was designed to handle situations where an individual is away from the facility, ostensibly to go to a specific location or for a particular reason, and ends up where he or she is not authorized or supposed to be. I think it is unreasonable to conclude that "place" under subsection 3 necessarily includes the facility itself. Otherwise, why is there a need for a separate statute for escape that provides for a different penalty? When does a voluntary absence ever become an escape or vice versa? Can each day an individual is absent from a facility, or each bed check, become a separate crime of voluntary absence? If so, Miller was arrested nineteen days after he originally left the facility. Therefore he could potentially be charged with nineteen counts of voluntary absence and face up to nineteen years of incarceration. Under this scenario, why would a county attorney ever file an escape charge when it would be so much easier to simply file a multiple-count trial information for voluntary absence?[11]

There is a split of authority as to whether a prisoner who fails to return to custody following an unsupervised, permissive release from custody can be prosecuted under a broadly worded escape statute. *See* Annotation, *Failure of Prisoner to Return at Expiration of Work Furlough or Other Permissive Release Period as Crime of Escape*, 76 A.L.R.3d 658, 682–87 (1977) (describing cases in which prisoners have been held to be or not to be escapees for failing to return following a work release); 4

---

[11]Although *State v. Francois* considered whether absence from custody is a continuing offense, it did so to address the narrow question "whether the crime of absence from custody is a continuing offense for purposes of tolling the statute of limitations." 577 N.W.2d 417, 417 (1998). Thus, the court was careful to narrow the holding of the case to its facts. *See id.* at 421 (holding absence from custody "is a continuing offense for purposes of the statute of limitations").

Wharton's Criminal Law § 633 (15th ed. 2013), *available at* http://www.westlaw.com (updated 2013) (compiling cases in which prisoners have been, or have not been, held to have committed escape by not returning to prison).  As would be expected, the result often depends on the wording of the various state statutes involved.

Having said all this, however, and looking at the statute as written, I must agree that under the analysis of the majority, voluntary absence is a lesser included offense of escape.  If the legislature intends that an offense of this nature should be a separate and distinct crime for purposes of our escape statute, then it must more clearly define this in the statute.  Until then, any voluntary absence may or may not be a lesser included offense of escape, as the majority opinion acknowledges.  Without clarification, trial judges are left in the unenviable position of attempting to accurately instruct the jury and offering little assistance to the jury in reaching its decision.